# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CIVIL CASE NO.  3:07cv331
### [Criminal Case No. 3:02cr156-1]

| | |
|---|---|
| **JAMES E. MCLEAN, JR.,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **MEMORANDUM OF DECISION** |
| ) | **AND ORDER** |
| _____ ) | |
| ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Respondent.** ) | |
| _____) | |

**THIS MATTER** is before the Court on the Petitioner's Motion under 28

U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in

Federal Custody [Doc. 1] and the Government's Motion for Summary

Judgment [Doc. 14].

## BACKGROUND

On September 13, 2002, the Petitioner and six others were charged in

a 66-count superseding bill of indictment with participating in a wide-ranging

scheme to defraud investors in the secondary mortgage market by creating

and selling fictitious mortgage loans.  Specifically, the indictment charged that

the Petitioner conspired, along with his wife, Macy McLean, and five other co-

defendants to defraud the Federal National Mortgage Association ("Fannie Mae") by selling fictitious mortgage notes to it; to defraud the United States by pooling fictitious mortgage notes into securities issued by the Government National Mortgage Association ("Ginnie Mae"); to defraud Branch Banking & Trust ("BB & T") by assigning fictitious mortgage notes to it in exchange for advances under a mortgage loan agreement; and to launder the proceeds of their fraud, all in violation of 18 U.S.C. § 371 (Count One). [Criminal Case No. 3:02cr156, Doc. 45]. Counts Two through Ten charged the Petitioner with using interstate wire transmissions to sell false mortgage notes to Fannie Mae and aiding and abetting those offenses, in violation of 18 U.S.C. §§ 1343 and 2. [Id.]. Counts 11 through 21 charged the Petitioner with using interstate wire transmissions to submit false Housing and Urban Development ("HUD") documents to secure Ginnie Mae mortgage securities and aiding and abetting those offenses, in violation of 18 U.S.C. §§ 1343 and 2. [Id.]. Counts 22 through 32 charged the Petitioner with making false entries on monthly status reports required by HUD and aiding and abetting those offenses in violation of 18 U.S.C. §§ 1006 and 2. [Id.]. Counts 33 through 36 charged him with submitting false statements on HUD forms 11705 and 11706 in connection with the Ginnie Mae scheme and aiding and abetting those offenses in violation of 18 U.S.C. §§ 1001 and 2. [Id.]. Counts 37 through 52 charged the

2

Petitioner with making and passing false mortgage notes to influence HUD and aiding and abetting those offenses in violation of 18 U.S.C. §§ 1010 and 2. [Id.].[1] Counts 53 and 54 charged him with bank fraud against BB & T and aiding and abetting in those offenses in violation of 18 U.S.C. §§ 1344 and 2. [Id.]. Counts 55 through 66 charged the Petitioner with money laundering and aiding and abetting in those offenses in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) and 2. [Id.].

On November 12, 2002, the Court commenced a jury trial for the Petitioner, his wife, and his co-defendants, Paul and Debbie Zimmerman. The facts of the case are summarized in the Fourth Circuit's opinion on the Petitioner's direct appeal:

> Defendants James and Macy McLean were officers and owners of First Beneficial Mortgage Corp ("FBMC"), a mortgage company based in North Carolina. As a qualified Federal Housing Administration ("FHA") lender with direct endorsement authority, FBMC had the authority to approve mortgage loans for federal FHA insurance. An FHA-insured mortgage loan, in turn, is "readily saleable" on the secondary mortgage market. FBMC was also an approved Fannie Mae lender, meaning FBMC could originate a mortgage loan with the borrower and then Fannie Mae would immediately buy the mortgage on the secondary market without doing its own underwriting evaluation.

---

[1]The superseding indictment alleged violations of 18 U.S.C. §§ 1010 and 2 only with respect to Counts 37 through 47. [3:02cr156-1 Doc. 45 ¶¶ 60-61.] Subsequently, the Government filed a motion to correct the indictment by replacing the references to "Counts 37 through 47" in paragraphs 60 and 61 with "Counts 37 through 52." See id. at Doc. 105. The Court granted the motion. See id. at Doc. 107.

FBMC created a subsidiary company, First Beneficial Homes ("FBH"), which was in the business of building modular homes financed by FBMC. Paul and Debbie Zimmerman, both of whom were employed by FBMC, were officers in FBH, as was Macy McLean. In order to obtain funds for FBH to build homes, the McLeans, Zimmermans and a third couple, the Greens, recruited individuals, primarily friends and relatives, to sign mortgage loan notes purporting to secure funds advanced by FBMC for homes that, in fact, did not exist or were owned by someone other than the "borrower" named on the note. The McLeans and Zimmermans induced these individuals to sign the mortgage notes by paying them various amounts to participate in an "investment" opportunity and representing that, by signing, the "investors" did not actually incur any repayment obligation. The McLeans and Zimmermans also signed similar fictitious mortgage notes themselves. None of the individuals signing these documents ever acquired or possessed any ownership interest in the properties listed on the notes.

FBMC would then sell these "instruments" to Fannie Mae on the secondary market, representing by the terms of the note that the borrower signing the note had an ownership interest in the listed property, that FBMC had a security interest in the property, and that the property was of sufficient value to protect the lender-or any secondary purchaser of the loan such as Fannie Mae-in the event of default. As an approved Fannie Mae lender, FBMC had the authority to transfer its loans to Fannie Mae without having to submit the loans to any underwriting review process by Fannie Mae. Essentially, FBMC was empowered to make underwriting decisions on behalf of Fannie Mae.

Eventually, Fannie Mae detected irregularities in FBMC's underwriting practices and conducted an audit of the loans it had purchased. A physical inspection of the properties for which FBMC had purportedly financed the purchase of a completed home revealed that the many [sic] of the lots were either vacant or contained a partially completed house. Additionally, some of the lots that ostensibly secured mortgage loans already purchased by Fannie Mae were being offered for sale. James McLean claimed that he incorrectly assumed that Fannie Mae

would purchase construction loans, which disburse funds in piecemeal fashion as each new phase of construction begins. Fannie Mae, however, does not purchase construction loans, which FBMC was not authorized to sell. And, FBMC had not sold the loans as construction loans to Fannie Mae in any event. In November 1998, when FBMC could not account for all of the irregularities, Fannie Mae suspended FBMC as an approved lender.

Faced with the collapse of the Fannie Mae scheme, James McLean agreed to repurchase the loans FBMC sold to Fannie Mae. Although he told Fannie Mae that he had secured investors willing to fund the repurchase of these loans, he refused to divulge the identity of the investors. In fact, FBMC secured funds to repurchase the loans by simply continuing the Fannie Mae "investor" scheme with Ginnie Mae. Ginnie Mae, which is owned by HUD, sells mortgage-backed securities which are created from "pools" of mortgage loans. A qualified mortgage lender originates several FHA-insured mortgages, "pools" them together, and sells them-without any review-to Ginnie Mae. Ginnie Mae, in turn, sells an interest in the mortgage pool to investors. FBMC was qualified as a Ginnie Mae lender and issuer, meaning that not only did Ginnie Mae implicitly approve of any mortgage loan extended by FBMC, but FBMC could actually issue Ginnie Mae securities.

The McLeans and Zimmermans used the same lots and "investor scheme" with Ginnie Mae that they had used for Fannie Mae, and the overall process was essentially the same. James McLean paid a commission to the Zimmermans for each "investor" they recruited. The Zimmermans brought their investors to Macy McLean. Macy then gave her assistant these names, along with an address and a purported loan amount, which the assistant inserted into a mortgage note. Ginnie Mae would not accept mortgage loans that were not federally insured, so one of FBMC's loan officers was directed to "supply" an FHA number for the note. The mortgage notes were then signed by the "investors," and, as required by Ginnie Mae, delivered to FBMC's Ginnie Mae document custodian, BB & T bank, for initial certification. James and Macy McLean also had to file certain information electronically. FBMC then issued securities which were sold to

Ginnie Mae investors. The purchase price was wired to FBMC's account at BB & T.

FBMC also obtained a line of credit at BB & T to fund loans to its customers. As collateral to secure the line of credit, FBMC supplied BB & T with fictitious mortgage notes signed by "investors" who had no ownership interest in the property purportedly secured by the note. Although the line of credit was to be used by FBMC strictly for funding mortgage loans to FBMC clients, FBMC used line of credit money to pay down the fictitious loans sold to Ginnie Mae as well as to repurchase loans from Fannie Mae.

The government's evidence showed that only seven percent of the proceeds from the sale of the fictitious notes to Ginnie Mae went to fund legitimate expenses such as construction and land for FBH's business. One million dollars was allocated to the growing monthly payments on the increasing number of false mortgage notes, and approximately $340,000 was paid out to the Zimmermans and the Greens for commissions. The Zimmermans used structured transactions to deposit half of this into their personal accounts. And $7.5 million of the Ginnie Mae funds were simply transferred to Fannie Mae to repurchase the false notes.

United States v. McLean, 131 Fed.Appx. 34, 36-38 (4th Cir. 2005) (McLean I).

On November 22, 2002, the jury returned a special verdict, convicting the Petitioner on all 66 counts. [Criminal Case No. 3:02 cr156, Doc. 145]. Based on a total offense level of 37 and a criminal history category of II, the Petitioner's sentencing guidelines range was 235 to 293 months' imprisonment. United States v. McLean, 192 Fed.Appx. 234, 235 (4th Cir. 2006) (McLean II). The Court sentenced the Petitioner to 252 months of

imprisonment.  Id.

The Petitioner filed a timely appeal, which was consolidated with that of his wife, Macy, and their co-defendants, the Zimmermans.  Among the issues raised on appeal were that the trial court erred in refusing to give a "good faith" instruction for the counts alleging the passing of false mortgage instruments to HUD under § 1010; that the Government's evidence was insufficient to support the jury's finding of guilt on any of the charged counts; and that the Court erred in denying the Petitioner's motion for a downward departure under U.S.S.G. § 4A1.3.

The Fourth Circuit issued it's opinion on May 2, 2005, affirming the convictions of all appellants but vacating and remanding the cases for resentencing in light of the Supreme Court's decision in of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). McLean I, 131 Fed.Appx. at 41.  On remand, the Petitioner received the same sentence as previously imposed.  McLean II, 192 Fed.Appx. at 235-36.

The Petitioner appealed again, arguing that the sentence was unreasonable in light of Booker.  Id.  On July 31, 2006, the Fourth Circuit affirmed Petitioner's sentence.  Id.  The Petitioner filed a Petition for Writ of Certiorari, which was denied on June 29, 2007.  McLean v. United States, 551 U.S. 1165, 127 S.Ct. 3051, 168 L.Ed.2d 764 (2007).

On August 14, 2007, the Petitioner filed the instant motion to vacate alleging 23 grounds for relief, not including sub-claims. [Doc. 1]  On September 29, 2009, he filed a motion to amend to add a claim of ineffective assistance of counsel for failure to argue that the Petitioner was legally innocent of counts 55-66 of the indictment. [Doc. 3].  The Court allowed the motion. [Doc. 4].  The Respondent filed a Response and a Motion for Summary Judgment on July 24, 2009. [Doc. 13, Doc. 14].  On September 30, 2009, the Petitioner filed a memorandum of law and exhibits in support of his Motion to Vacate. [Doc. 16].  Subsequently, he filed a document titled "Declaration," in which he provided additional facts to the affidavit filed with his § 2255 motion. [Doc. 17].  He also filed a second memorandum of law on April 19, 2010, in which he claimed that the Court used the wrong version of the sentencing guidelines to determine his sentence.[2] [Doc. 18].

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure state, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3]  The Court carefully has

---

[2]The case was reassigned to the undersigned when the sentencing judge retired.

[3] Rule 56 was amended effective December 1, 2010.  The quoted language appears in the version of the Rule in effect at the time the motion was filed.  The

considered the parties' arguments along with the relevant law governing those arguments. Indeed, the Court already has considered and rejected most of the grounds raised in the Petitioner's Motion to Vacate when it denied a virtually identical motion to vacate filed by his wife and co-defendant, Macy McLean. [Civil Case No. 3:06cv293, Doc. 13]. Based upon the forgoing, the Court has determined the Respondent's Motion for Summary Judgment should be granted and the Petitioner's Motion to Vacate should be denied and dismissed.

## DISCUSSION

In his Motion to Vacate, the Petitioner raises 23 claims, many of which have sub-claims, including claim #23, which has 28 sub-claims alleging ineffective assistance of counsel. Additionally, as indicated previously, the Petitioner attempts to raise a new claim in his final "memorandum" in support of his § 2255 motion. [Doc. 18]. The Court will address that issue before turning to the claims raised in the Motion to Vacate, which can be grouped into broad categories.

## A. Claim that Court Used the Wrong Sentencing Guidelines

In a filing entitled "Memorandum In Support of Motion Pursuant to §

---

substance of the standard as it applies to this case had not changed with the amendment.

2255," the Petitioner claims that the Court used the wrong version of the sentencing guidelines when it sentenced him.[4]  The Petitioner, however, has not sought leave of the Court to amend his Motion to Vacate to add this claim. Furthermore, even if the Court were to construe the filing liberally as a Motion to Amend, such a motion would not be granted.

Rule 12 of the Rules Governing § 2255 Proceedings states that, "[t]he Federal Rules of Civil Procedure . . . to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."  Rule 15 of the Federal Rules of Civil Procedure governs when a party may amend a pleading.  That rule is, however, in some respects inconsistent with § 2255(f) which imposes a one-year statute of limitations on motions to vacate.

The one-year statute of limitations expired for the Petitioner on or about June 30, 2008, a year after the Supreme Court denied his Petition for Writ of Certiorari.  See § 2255(f)(1).  Therefore, the Petitioner's "memorandum," filed almost two years later on April 19, 2010, is untimely in its attempt to raise a new issue.  See id.

When a proposed amendment is barred by the statute of limitations,

---

[4]It is not clear from Petitioner's memorandum whether he is referring to his original sentencing or his resentencing after remand.

Rule 15(c) of the Federal Rules of Civil Procedure provides for the relation back of amendments to the filing date of the original pleading under certain circumstances. Relation back is permitted when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out ... in the original pleading[.]" Fed.R.Civ.P. 15(c)(1)(B). A proposed amendment, however, does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005). "The 'original pleading' to which Rule 15 refers is the complaint in an ordinary civil case, and the petition in a habeas proceeding." Id., at 655. In this case, the original pleading is the Motion to Vacate. U.S. v. Hernandez, 436 F.3d 851, 857 (8th Cir. 2006), *certiorari denied* 547 U.S. 1172, 126 S.Ct. 2341, 164 L.Ed.2d 856 (2006) (citations omitted).

The Petitioner's allegation that the Court used the wrong version of the sentencing guidelines is a new ground for relief that differs in both time and type from any of the allegations raised in the Motion to Vacate. Therefore, it does not relate back to the motion to vacate and is untimely. Mayle, 545 U.S. at 650. Consequently, the Court will not consider it.

**B. Procedurally Defaulted Claims**

In his Motion to Vacate, Petitioner asserts numerous claims that he

could have raised on direct appeal but did not.  These are:

(1) Ground One in which Petitioner argues that Counts 37 through 52 of the indictment, charging making and passing false statements and mortgage notes to HUD, were constructively amended;

(2) Ground Two in which Petitioner alleges that Counts Two through Ten of the indictment, charging wire fraud, were constructively amended;

(3) Ground Three in which Petitioner alleges that Counts 11 through 21 of the indictment, charging wire fraud, were duplicitous;

(4) Ground Four in which Petitioner alleges that Counts 37 through 52, charging making and passing false statements and mortgage notes to HUD, were duplicitous;

(5) Ground Five in which Petitioner alleges that Counts 37 through 52 were constructively amended;

(6) Ground Six in which Petitioner argues that the indictment was constructively amended through the Court's instruction to the jury on willful blindness;

(7) Ground Seven in which Petitioner argues that Counts 22 through 32 of the indictment, charging making false statements to an agency of the United States, were constructively amended;

(8) Ground Eight in which Petitioner argues that Counts 55 through 66 of the indictment, charging money laundering, were constructively amended;

(9) Ground 9a in which Petitioner alleges that Counts Two through 21 of the indictment, charging wire fraud, were constructively amended;

(10) Ground 9b in which Petitioner alleges that Counts 11 through 52 of the indictment were constructively amended;

(11) Ground 10a in which Petitioner alleges that Counts 53 and 54 of the indictment, charging bank fraud, were constructively amended;[5]

(12) Ground 11a in which Petitioner argues that Counts 9 and 10 of the indictment, charging wire fraud, were multiplicitous;

(13) Ground 12 in which Petitioner argues that Counts 37 through 39; Counts 40 and 41; Counts 43 and 44; Counts 46 through 48; and Counts 49 through 52, respectively, were multiplicitous charges;

(14) Ground 12b in which Petitioner argues that he was sentenced in violation of the Double Jeopardy Clause as to Counts 9 and 10; Counts 37 through 39; Counts 40 and 41; Counts 43 and 44; Counts 46 through 48; and Counts 49 through 52, respectively, because the charges were multiplicitous and should not have generated separate sentences;

(15) Ground 19a in which Petitioner argues that Counts 22 through 32, charging false statements to an agency of the United States, were duplicitous; and

(16) Ground 19b in which Petitioner argues that Counts 33 through 36, charging false statements to a lending institution, were duplicitous.

[Doc. 1, at 5-17, 33-34.]  Generally, claims that could have been, but were not, raised on direct review are procedurally barred by default.  United States v. Pettiford, 612 F.3d 270, 280 (4th Cir. 2010), *certiorari denied* ___ S.Ct. ___, 2010 WL 4155808, 79 USLA 3300 (2010) (citations omitted).  In order to

---

[5]Petitioner does not allege any Ground 10b or 11b in his Motion [Doc. 1].  The Court nonetheless refers to these arguments as Grounds 10a and 11a, as did Petitioner.  Any references throughout this opinion to Grounds 10 or 11 are references to said Grounds 10a and 11a as so identified by Petitioner in his Motion.

collaterally attack a conviction or sentence based upon alleged errors that could have been pursued on direct appeal but were not, a petitioner must show cause and actual prejudice resulting from the errors complained of, or that he is actually innocent. United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999), *certiorari denied* 529 U.S. 1010, 120 S.Ct. 1283, 146 L.Ed.2d 230 (2000) (citations omitted).

Although the Petitioner asserts that these claims were not raised due to counsel's ineffectiveness, this conclusory assertion falls far short of establishing "cause" for his procedural default. As the Supreme Court long ago observed, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 486, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Rather, to establish "cause" for his procedural default of these claims, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the [ ] procedural rule." Id., at 488.

Here, the Petitioner has not identified any factor external to the defense that impeded counsel's ability to raised these issues on appeal. Consequently, he has not established cause to excuse his default of these claims Id. Nor has he demonstrated that he is actually innocent of the

charges for which he was sentenced.  <u>Mikalajunas</u>, 186 F.3d, at 493 (citation omitted).  Therefore, claims One, Two, Three, Four, Five, Six, Seven, Eight, Nine(a) and (b), 10a, 11a, 12, 12(b), and 19(a) and (b) are barred by Petitioner's procedural default.

## C. Procedurally Barred Claims

Issues that were decided on direct appeal may not be raised again on collateral review absent an intervening change in the law that can be applied in a collateral proceeding.  <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976), *certiorari denied* 429 U.S. 951, 97 S.Ct. 371, 50 L.Ed.2d 320 (1976); <u>United States v. Roane</u>, 378 F.3d 382, 396 n. 7 (4th Cir.2004), *certiorari denied* 546 U.S. 810, 126 S.Ct. 330, 163 L.Ed.2d 43 (2005).  In this case, the Petitioner and his co-defendants challenged the sufficiency of the evidence to support each of their convictions, and the Fourth Circuit rejected these claims, holding that "there was ample evidence for a reasonable trier of fact to have found defendants guilty beyond a reasonable doubt on each count of conviction." <u>McLean I</u>, 131 Fed.Appx., at 41.

Because the Petitioner cannot point to any intervening change in the law with respect to these claims, each of the claims of insufficiency of the evidence raised in the instant motion to vacate are foreclosed by this holding. These claims include:

(1) Ground 13a in which the Petitioner argues insufficient evidence to support his convictions under Counts One, Two through 32, and 37 through 56 because the Government failed to prove intent or willful blindness;

(2) Ground 13b in which the Petitioner argues insufficient evidence to support his convictions under Counts 33 through 36 because the Government failed to prove materiality or intent;

(3) Ground 14 in which the Petitioner argues insufficiency of the evidence to support his convictions under Counts 37 through 41 because the Government failed to prove that he acted knowingly and intentionally or willfully and because it failed to prove the materiality of the false mortgage notes referenced in these charges;

(4) Ground 15 in which the Petitioner argues insufficiency of the evidence to support his conviction under Count One because the Government failed to prove that he acted knowingly and intentionally with respect to the conspiracy;

(5) Ground 16 in which the Petitioner argues insufficiency of the evidence to support his convictions under Counts 22 through 32 because the Government failed to prove that he acted knowingly and intentionally or that the false statements made by Petitioner were "material";

(6) Ground 17 in which the Petitioner argues insufficiency of the evidence to support his convictions under Counts 55 and 56 of the indictment, charging money laundering, because the Government failed to prove that he intended to promote unlawful activities, that he knew the financial transactions at issue involved proceeds from a criminal offense, or that he acted knowingly and intentionally.

(7) Ground 18 in which the Petitioner argues insufficiency of the evidence as to Counts 53 and 54, charging bank fraud, because the Government failed to prove that the bank was exposed to any financial risk, failed to prove that the scheme was designed to defraud the bank, failed to prove that he acted knowingly, and

failed to prove that the acts charged were accomplished through "material" false representations;

(8) Ground 20 in which the Petitioner argues insufficiency of the evidence to support his convictions under Counts Two through Ten; Counts 22 through 32; and Counts 37 through 54 because the Government failed to prove that Petitioner aided or abetted any of the acts charged; and

(9) Ground 21 in which the Petitioner argues insufficiency of the evidence to support his convictions under Counts Two through 21 because the Government failed to prove materiality and that he acted knowingly and intentionally.

Additionally, in Ground 21b, the Petitioner contends that the Court erred in denying his motion for downward departure based on an overstatement of his criminal history. The Petitioner raised this issue on appeal, arguing that the Court "reversibly erred in denying" his motion for a downward departure under Sentencing Guidelines § 4A1.3, which authorizes a downward departure "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]" [Brief of Appellants at 51-55, McLean I, supra. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322]. On appeal, the Fourth Circuit rejected Petitioner's argument, stating that it had "considered . . . defendant's argument with respect to the application of the guidelines and conclude[d] that the district court committed no error in that regard." McLean

I, 131 Fed. Appx., at 41.

For the foregoing reasons the Petitioner is foreclosed from re-litigating the following claims:  13(a) and (b), 14, 15, 16, 17, 18, 20, 21, and 21(b). Therefore, these claims will be dismissed and denied as procedurally barred.

## D.  Prosecutorial Misconduct Claims

The Petitioner contends that the prosecutor engaged in misconduct by suborning perjury from James Beatty, Sharon Abrams, Richiedean Gess, Sandra Dixon, and Eric Brown.  He further alleges that the prosecutor committed Brady[6] violations by failing to disclose FBMC's business plan and loan request letter to BB & T for a warehouse line of credit and by failing to disclose the application and approval letter(s) which related to FBMC's authorization to issue Title I manufactured home loan guarantees.  Finally, the Petitioner alleges that the prosecutor included misleading or inaccurate quotes in the Government's appellate brief.

### 1.  Suborning Perjury Claims[7]

In order to succeed on a claim of prosecutorial misconduct based upon perjured trial testimony, a petitioner first must show that the testimony was, in fact, perjured, and second, that the Government knowingly used the perjured

_____

[6]Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[7]Alleged in Ground 22 ¶¶ 1, 4-6, 8, and 10 of Petitioner's Motion to Vacate.

testimony in order to secure the conviction. Boyd v. Fench, 147 F.3d 319, 329-30 (4th Cir. 1998), *certiorari denied* 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999), *citing* Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, "[m]ere inconsistencies in the testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987).

The Petitioner alleges that James Beatty perjured himself before the grand jury by testifying that he had made mortgage payments on a FBMC home loan when other witnesses had told the FBI that Beatty had not made any payments. Similarly, the Petitioner alleges that Sharon Abrams perjured herself by testifying[8] that she did not have access to Fannie Mae and Ginnie Mae manuals when another witness (the Petitioner himself) testified that Ms. Abrams had on-line access to manuals. [Criminal Case No. 3:02cr156, Trial Tr. Vol. V, at 1237]. All the Petitioner has shown is that inconsistencies existed between the testimony of various witnesses, which is insufficient to show that the Government knowingly suborned perjury. Griley, 814 F.2d at 970-71. Furthermore, whether Beatty made mortgage payments on his own loan and whether Abrams had access to government manuals were facts

---

[8]Petitioner has failed to include the transcripts of testimony in the record in this case. That would provide an additional basis for rejecting these arguments. The trial transcripts, however, appear in the record of the underlying criminal case [3:02cr156], and show that Petitioner's claims are without merit.

immaterial to whether the Petitioner conspired to defraud the government and BB & T.

Similarly, the allegedly perjurious testimony of Richiedean Gess, a former FBMC employee, who stated that she was not consulted on underwriting or asked to underwrite construction loans was contradicted by the Petitioner's testimony on cross-examination. The Petitioner testified that he had consulted Ms. Gess about FBMC's "investor program" initially when the loans were sold to Fannie Mae, but not when they were pooled as Ginnie Mae certificates. [Id., Trial Tr. Vol. V, at 1322]. As set forth previously, the fact that various witnesses testified inconsistently with each other is insufficient to show that the prosecutor suborned perjury. Griley, 814 F.2d at 970-71.

As for Sandra Dixon, a Ginnie Mae account executive, the Petitioner contends that her testimony that a single family loan issuer cannot place manufactured home loans into a Ginnie Mae single family pool was false in light of another government witness's statement to the FBI that manufactured home loans could be placed into Ginnie Mae single family pools. The same individual, however, told the FBI that such homes could be placed in a Ginnie Mae pool only if they were "stick-built and are permanent." [Doc. 16-1, at 9]. Again, Petitioner merely has shown that two people *possibly* made

inconsistent statements; he has not shown that Ms. Dixon testified falsely. Griley, 814 F.2d at 970-71.

Finally, with respect to Eric Brown's testimony, the Petitioner's allegation of perjury rests on alleged inconsistencies between Brown's testimony on direct and his testimony on cross-examination. To the extent that these inconsistencies existed, they arose *during* Brown's testimony. Assuming for the sake of argument that Brown did testify falsely on direct examination, the Petitioner has failed to point to any evidence that the prosecutor knew that he was testifying falsely. Furthermore, because they were made during Brown's testimony, the jury had the benefit of Brown's allegedly inconsistent statements when making its credibility determinations.

The Petitioner also claims that the Government knew that Brown testified falsely about a meeting he had with the Zimmermans and the Petitioner during which the Petitioner told Brown that FBMC's investor program was "legal but not really legal." The Petitioner relies on the statements of two unidentified individuals who told the FBI that the Petitioner was not at that meeting. Again, the Petitioner merely has shown that two people said something that was inconsistent with Brown's testimony. Such evidence is insufficient to show that Brown committed perjury and that the Government knew it at the time of his testimony. Id.

## 2. **Brady** Violation[9]

The Petitioner next contends that the prosecution failed to "bring forth" FBMC's business plan and loan request letter to BB & T for a warehouse line of credit, which, according to the Petitioner, would have shown that BB & T knew that FBMC was issuing loans for manufactured housing. Additionally, the Petitioner contends that the Government failed to "bring forth" FBMC's application to issue HUD-backed Title I manufactured housing loans and the approval letter from HUD granting the application.

In Brady v. Maryland, the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where the evidence is material either to guilt or to punishment . . .[.]" Brady, 373 U.S. at 87. In order to establish a Brady violation, a petitioner must show that the evidence at issue (1) is favorable to him, whether directly exculpatory or of impeachment value; (2) was suppressed by the Government; and (3) is material. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In order to establish the "materiality" component, the Petitioner must show that "there was a reasonable probability" that the result of his trial would have been different if the evidence had been disclosed to the defense. Id., at 280.

_____

[9]Alleged in Ground 22 ¶¶ 2-3 of the Petitioner's Motion to Vacate.

For the government to suppress evidence, it is axiomatic that the evidence first must exist. The Petitioner testified that BB & T loan officer John Ellis knew that FBMC was funding construction loans with BB&T's warehouse line of credit. [Criminal Case No. 3:02cr156, Trial Tr. Vol. V, at 1325-26]. Ellis, however, testified that BB&T rejected the Petitioner's proposal to have the bank fund closings for mobile homes or construction loans. [Id., at Vol. IV, 904-05]. Neither Petitioner nor Ellis testified that FBMC had submitted a formal written business plan. As such, the Petitioner has failed to show that the allegedly exculpatory evidence existed. Consequently, he has also failed to show that the Government suppressed it.

As for FBMC's application to become a Title I issuer of manufactured housing loans insured by HUD and the letters approving FBMC's application, the Petitioner has failed to show that any such evidence was material to his defense.[10]

Whether FBMC was conditionally authorized to issue manufactured

---

[10]These documents were not produced at trial by the Petitioner, any of his co-defendants, or the Government. The Petitioner obtained a copy through a Freedom of Information Act request to HUD. [Doc. 16-2, at 12-17]. Ginnie Mae executive, Sandra Dixon, testified that when it applied to become a Ginnie Mae issuer, FBMC sought only to issue single-family loans and that FBMC had left blank the boxes to apply to be either a manufactured housing or a mobile home loan issuer. [Criminal Case No. 3:02cr156, Trial Tr. Vol. VI, at 1641]. She testified further that she had reviewed FBMC's file prior to her testimony and that it contained no application to be a Ginnie Mae manufactured home loan issuer. [Doc. 16-2, at 12-17; Doc. 16-1, at 31, Trial Tr. Vol. VI, at 1642].

home mortgage loans for Ginnie Mae or fund construction loans through BB & T is not relevant to the issue of whether the Petitioner and his co-defendants were authorized to engage in the practices at issue in their trial. The evidence at trial showed that the defendants created, sold, and pooled loans made to straw borrowers and for which there were no actual homes provided as collateral. [Id., Trial Tr. Vol. IV, 1073-81]. Therefore, the loans that were pooled as Ginnie Mae securities and the loans that were funded with the BB&T warehouse line of credit did not qualify as FHA single-family loans, Title I manufactured housing loans, or construction loans. They never could have been because they were fraudulent. Consequently, it is immaterial whether the Petitioner or his co-defendants were, in fact, authorized to make, sell, or pool *legitimate* loans because that authorization would not extend to the types of fictitious loans they were creating and selling.

For the forgoing reasons, the Petitioner cannot show that the Government suppressed material, exculpatory evidence. His Brady claim fails.

### 3. Improper Appellate Arguments[11]

The Petitioner contends that counsel for the Government misrepresented the record on appeal. Specifically, the Petitioner contends

---

[11]Alleged in Ground 22 ¶¶ 7 and 9 of the Petitioner's Motion to Vacate.

that the Government misquoted a statement made by his wife, Macy, on direct appeal; misquoted Eric Brown's testimony at trial; and misrepresented the number of houses that the defendants had built during the conspiracy.

In reviewing a claim of prosecutorial misconduct based upon improper remarks or arguments, this Court must determine "whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002), *certiorari denied* 537 U.S. 963, 123 S.Ct. 397, 154 L.Ed.2d 320 (2002) (internal quotation marks and citation omitted). The test for reversible prosecutorial misconduct is two-fold. A petitioner must show "(1) that the prosecutor's remarks or conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the [petitioner] to such an extent as to deprive [him] of a fair [proceeding]." United States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007) (citation omitted).

In its brief on appeal, the Government argued that "Macy McLean concedes that her husband 'avoided auditors, misled others and acted in a manner that could arise to circumstantial evidence of knowingly participating in a scheme to defraud.' App. Br. 32." [Brief for the United States at 32, McLean I, supra., (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245323]. As indicated by the citation to the Appellants' brief, the internal

quote is taken from Macy McLean's brief on appeal. [Brief of Appellants at 32, McLean, supra. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322]. Although he accuses the Government of misquoting his wife, Petitioner's own argument belies this assertion. [Doc. 1-1, at 42]. Petitioner argues that counsel for the Government knew that "[his] wife did not make this statement and that it was [her] . . . attorney that made this statement." [Id.].

It is self-evident that counsel for the Government knew that it was the wife's attorney who made the statement in question. It was the attorney, and not her client, Macy, who drafted and filed the appellate brief on Macy's behalf. As to whether her attorney had Macy's permission to include this statement in the brief, the Petitioner has failed to cite any evidence that the Government was privy to such information. He, therefore, cannot show that the prosecutor's citation to Macy's appellate brief was improper.

The Petitioner also claims that the Government misled the Fourth Circuit by stating that the conspirators "built only a dozen homes, [and] sold none" and by stating that "Eric Brown testified that [the Petitioner] explicitly stated that his 'investor' program was not 'really legal'" [Brief for the United States, at 19, 30 n.11, McLean, supra. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322]. According to the Petitioner, the conspirators built about 30 homes and sold at least five. The Petitioner also contends that his

statement to Brown about the legality of the investor program was ambiguous, not explicit.

The record shows that the Petitioner admitted on cross-examination that he built only "about 12 houses," but issued over 100 "investor loans." [Criminal Case No. 3:02cr156, Trial Tr. Vol. V, at 1320]. As for the Government's statement about Eric Brown's testimony, Brown testified that the Petitioner told him the investor program "was legal, but [ ] not really legal."[12] [Id., Trial Tr. Vol. IV, at 871]. Because Government counsel's representations were supported by the record and were fair comments on the evidence at trial, the Petitioner cannot establish prosecutorial misconduct.

## E. Ineffective Assistance of Trial and Appellate Counsel

In Ground 23 of his Motion to Vacate, Petitioner raises 28 claims of ineffective assistance of trial and appellate counsel. Most are tied in some way to the substantive claims already addressed in this Order. The Respondent denies that the Petitioner has established a constitutional violation and has submitted an Affidavit from the Petitioner's former counsel in support of its Motion for Summary Judgment. Defense counsel's affidavit states, *inter alia*, that he and associates from his law firm thoroughly

---

[12]The Court notes that the Government's brief on appeal contains the entire quotation from Mr. Brown's testimony. [Brief for the United States, at 20, McLean, supra., (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322].

researched the record, transcripts, and associated documents and that he raised all viable issues on appeal.  [Doc. 13-1, at 2].

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  In addition, case law requires that to satisfy this right, the assistance must be effective.  Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.").  This right to effective assistance of counsel extends to the direct appeal phase of the case as well. Evitts v. Lucey, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

In order to establish a claim for relief, the Petitioner must demonstrate that counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness when considered in light of the prevailing norms of practice and that such deficiency prejudiced him such that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S., at 687-88, 694.  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." Id.

In reviewing claims of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential"; therefore, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. Furthermore, the Petitioner "bears the burden of proving Strickland prejudice," and if he fails to do so "a reviewing court need not consider the performance prong." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992), certiorari denied 506 U.S. 885, 113 S.Ct. 243, 121 L.Ed.2d 176 (1992) (citations omitted). Finally, it must be remembered that "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993), certiorari denied 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993).

## 1. Defective Indictment[13] & Constructive Amendment[14]

The Petitioner claims that counsel was ineffective for failing to object at trial and on appeal to what he perceives as defects in and constructive amendments to the superseding indictment. He contends that Counts 2

---

[13]Alleged in Ground 23 ¶ 2; also alleged in Grounds One, Five, and Eight through Ten of the Petitioner's Motion to Vacate.

[14]Alleged in Ground 23 ¶ 1; also alleged in Grounds One, Two, and Five through Ten of the Petitioner's Motion to Vacate.

through 21 and 37 through 66 were defective because they failed to include the required *scienter* as an essential element of the charged offenses. The Petitioner contends further that the Court then constructively amended the offenses charged in the indictment when it gave a *scienter* instruction to the jury for each offense. The Petitioner also contends that the Government constructively amended the indictment when it presented evidence beyond that noticed in the indictment. In his affidavit, the Petitioner's counsel states that he did not raise these objections at trial or on appeal because they are not supported by law. [Doc. 13-1, at 1].

To be sufficient, an indictment must contain each of the essential elements of the charged offense. United States v. Lockhart, 382 F.3d 447, 449 (4th Cir. 2004) (citation omitted). Additionally, it must enable a defendant to "plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (citation omitted). It is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words are unambiguous and set forth all of the elements of the offense charged. Id. (citation omitted).

A "constructive amendment" of an indictment occurs "'[w]hen the government, through its presentation of evidence or its argument, or the

district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment[.]'" United States v. Ashley, 606 F.3d 135, 141 (4th Cir. 2010), *certiorari denied* 131 S.Ct. 428, 79 USLW 3245 (2010), *quoting* United States v. Malloy, 568 F.3d 166, 178 (4th Cir. 2009), *certiorari denied* 130 S.Ct. 1736, 176 L.Ed.2d 212 (2010). "A constructive amendment is a fatal variance because the indictment is altered 'to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999), *quoting* United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). Any other variance "does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." Ashley, 606 F.3d at 141, *quoting* Malloy, 568 F.3d at 178 (internal quotation marks omitted).

### a. Jury Instructions

The Petitioner contends that Counts 2 through 21, and 37 through 66 are defective because they either are missing the *scienter* element of the offenses or because they do not contain the same words to describe the *scienter* element as used by the Court when instructing the jury on the

*scienter* element of the offenses. The Petitioner also contends that the Court, by using words not in the indictment to describe the *scienter* elements to the jury, constructively amended the indictment.

The Petitioner asserts, for example, that Counts 2 through 21, which allege wire fraud against Fannie Mae and Ginnie Mae and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2, are defective for failing to allege that the "representations, statements or omission in the wire communication were material to the scheme or artifice [to defraud];" that Counts 37 through 52, alleging the making and passing of counterfeit mortgage notes in violation of 18 U.S.C. § 1010, are defective because they fail to include the words "aiding and abetting" and "knowingly and intentionally;" that Counts 53 through 54, the bank fraud charges, are defective for failing to allege that the false representations were "material;" and that Counts 55 through 66, the money laundering charges, are defective for failing to allege "knowingly and intentionally." The Petitioner appears to believe that the words quoted above were required to be included in the indictment because the Court used them in its charge to the jury. The Petitioner misunderstands the law.

As an initial matter, each of the offenses tracked the language of the statute charged and contained the required *scienter* elements. Counts 2 through 21, the wire fraud counts, allege the defendants "did knowingly and

willfully devise and intend to devise a scheme and artifice to defraud" and to obtain money and property by means of "material false and fraudulent pretenses." [Criminal Case No. 3:02cr156, Doc. 45, at ¶¶ 50-55]. Counts 37 through 52 allege the named defendants made and passed counterfeit mortgage notes "knowing them to be false" and "counterfeited." [Id., Doc. 45, at ¶¶ 60-61]. Counts 55 through 66, the money laundering counts, state that the Petitioner and his wife "knowingly" conducted or "willfully" caused another to conduct certain financial transactions when they "knew" said transactions involved the proceeds of specified unlawful activities, intending that the transactions would promote the mortgage fraud scheme described throughout the introductory paragraphs and Count One of the indictment. [Id., Doc. 45, at ¶¶ 64-66].

Finally, Counts 53 and 54, the bank fraud counts, allege that the named defendants "did knowingly execute and attempt to execute a scheme and artifice to defraud BB&T." [Id., Doc. 45, at ¶¶ 62-63]. Furthermore, the fact that Counts 53 and 54 did not contain the word "material" did not render the indictment defective. The Supreme Court has held that materiality is an element of a scheme or artifice to defraud under the mail, wire, and bank fraud statutes and that the jury must be so instructed. United States v. Neder, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In the absence of the

word "material" or "materiality," however, an allegation of fraud in the indictment will be sufficient to pass constitutional muster, as long as the *facts* alleged in the indictment warrant an inference of materiality.  United States v. Saybolt, 577 F.3d 195, 205 (3rd Cir. 2009), *certiorari denied* 130 S.Ct. 1107, 78 USLW 3393 (2010), *citing* United States v. Creech, 408 F.3d 264, 269 (5th Cir. 2005), *certiorari denied* 546 U.S. 1050, 126 S.Ct. 777, 163 L.Ed.2d 602(2005) (internal quotations and citation omitted); United States v. McAuliffe, 490 F.3d 526, 532 (6th Cir. 2007), *certiorari denied* 552 U.S. 976, 128 S.Ct. 442, 169 L.Ed.2d 309 (2007); United States v. Ladum, 141 F.3d 1328, 1334 (9th Cir. 1998), *certiorari denied* 525 U.S. 1021, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998); United States v. Adler, 623 F.2d 1287, 1292 n. 6 (8th Cir. 1980) (holding that the indictment was not defective for failing to use the word "materiality" because "sufficient facts are alleged to establish materiality"); United States v. Kirby, 587 F.2d 876, 882 (7th Cir. 1978) (rejecting a claim that the indictment was insufficient for failing to allege materiality because, based on the facts alleged, "[t]he materiality of the false statements is self-apparent").  Here, Counts 53 and 54 incorporated by reference paragraphs one through nine of the Introduction and each of the allegations made in Count One, which alleged sufficient facts to establish materiality.  Therefore, the indictment was not defective.  Creech, 408 F.3d at

269, *citing* <u>United States v. Richards</u>, 204 F.3d 177, 191-93 (5th Cir. 2000), *certiorari denied* 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 36 (2000), *overruled on other grounds* <u>United States v. Longoria</u>, 298 F.3d 367, 371 n.6 (5th Cir. 2002), *certiorari denied* 537 U.S. 1038, 123 S.Ct. 573, 154 L.Ed.2d 459 (2002) (wire fraud counts that incorporated allegations from conspiracy count sufficiently warranted inference of materiality of misrepresentation). Thus, the Court's instruction that the defendants' misrepresentations to BB&T must be "material" was proper and did not constructively amend the indictment.

Likewise, the fact that the Court instructed the jury on aiding and abetting does not render the indictment defective or constructively amended with respect to Counts 37 through 52. Although they do not contain the words "aiding and abetting," a review of the superseding indictment reveals that Counts 37 through 52 were preceded and followed by specific citation to 18 U.S.C. § 2, the aiding and abetting statute. [Criminal Case No. 3:02cr156, Doc. 45, at ¶¶ 60-61]. Furthermore, aiding and abetting is implied in every federal indictment of a substantive offense. <u>Ashely</u>, 606 F.3d at 143, *citing* <u>United States v. Wills</u>, 346 F.3d 476, 495 (4th Cir. 2003), *certiorari denied* 552 U.S. 925, 128 S.Ct. 301, 169 L.Ed.2d 816 (2004). The reason for this is that aiding and abetting merely describes the way in which a defendant's conduct resulted in the violation of a particular law; it does not set forth an essential

element of the offense with which the defendant is charged or itself create a separate offense. Id. , *citing* United States v. Thirion, 813 F.2d 146, 151 (8th Cir. 1987). Therefore, aiding and abetting need not be charged in an indictment for an instruction on it to be given at trial. Id.

The law also does not require that the words "willful blindness" appear in the charged offense before a court may instruct on how that legal theory might apply to the facts of the case. Rather, "[a] willful blindness instruction is proper 'when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance.'" McLean I, 131 Fed. Appx. at 38, *quoting* United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996), *certiorari denied* 517 U.S. 1229, 116 S.Ct. 1868, 134 L.Ed.2d 965 (1996). The Fourth Circuit specifically found that the Court's "willful blindness" instruction was proper in this case. See McLean I, 131 Fed.Appx. at 40.

The indictment in this case passes constitutional muster in that it was sufficient to put the Petitioner on notice of the offenses charged and to bar any future prosecutions for the same crimes. Hamling, 418 U.S. at 117. Furthermore, each of the Court's instructions challenged by Petitioner either tracked the language of the statute or pertained to an issue not required to be alleged in the indictment. United States v. Wills, 346 F.3d 476, 494 & n.13 (4th Cir. 2003), *certiorari denied* 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d

816 (2004). While the Court's instructions may have included different words to explain the required *scienter* to the jury, that does not mean the indictment was defective or that it was constructively amended. Consequently, the Petitioner cannot show that counsel was ineffective for failing to raise these issues at trial or on appeal. Strickland, 466 U.S. at 687-88, 694.

### b. Government's Evidence

The Petitioner also contends that the Government constructively amended the superseding indictment by presenting evidence to the jury that deviated from the specific allegations in the charged offenses. However, not all differences between an indictment and proof at trial rise to the level of a constructive amendment. Randall, 171 F.3d at 203 (citation omitted). When different evidence is presented at trial than specified in the indictment, but such evidence does not otherwise alter the crime charged in the indictment, a mere variance occurs. Id.

In this case, the evidence presented at trial did not alter, in any way, the crimes charged in the indictment. The superseding indictment charged a broad scheme to defraud Fannie Mae, Ginnie Mae, and BB&T, as well as investors in the secondary mortgage market, and to launder the proceeds of that scheme. [Criminal Case No. 3:02cr156, Doc. 45, at ¶¶ 10-49]. In Counts Two through Ten, the indictment charged the Petitioner with devising a

scheme to defraud Fannie Mae which was executed through the use of interstate wire transmissions, that is, the transfer of funds from Fannie Mae to FBMC's bank accounts. [Id., Doc. 45, at ¶¶ 50-52]. The Petitioner contends that the Government constructively amended the indictment by introducing evidence that he and his co-defendants transmitted false mortgage notes and assignments to Fannie Mae. However, the introductory paragraphs of the superseding indictment, as well as Count One (overarching conspiracy allegation), are specifically incorporated into Counts Two through Ten by reference. [Id., Doc. 45, at ¶ 50]. Paragraphs 12 through 14 and 22 of Count One allege the defendants made and sold 31 false mortgage notes to Fannie Mae. Therefore, contrary to the Petitioner's argument, the indictment did allege that he and his co-defendants made false mortgage notes and assignments.

Likewise, in Counts 37 through 52, the indictment charged that the Petitioner and his co-defendants made and passed false statements and counterfeit notes knowing they would be insured by HUD. [Id., Doc. 45, at ¶¶ 60-61]. The Petitioner contends that the Government constructively amended the indictment by introducing evidence that he and his co-defendants passed counterfeit notes to HUD. Paragraphs 16 and 23 through 34 of Count One, however, specifically allege that the conspirators made and sold in excess of

$21 million in false mortgage notes to Ginnie Mae, a corporation that is wholly owned by the United States and administered by HUD. Again, Count One is incorporated into Counts 37 through 47 by reference. [Id., Doc. 45, at ¶ 60]. Therefore, contrary to the Petitioner's argument, the indictment did allege that he and his co-defendants made and passed counterfeit mortgage notes.

The Petitioner makes similar allegations with respect to Counts 22 through 32 and Counts 55 through 66. They are equally without merit. Again, Count One was incorporated by reference into each of these counts. [Id., Doc. 45, at ¶¶ 56 & 64]. Paragraphs 23 through 34 of Count One specifically allege *how* the Petitioner made false statements to an agency of the United States (HUD). Paragraph 28 identifies wire transfers to FBMC from the investors who purchased the Ginnie Mae mortgage-backed securities at issue. Paragraphs 47 through 49 describe wire transfers and disbursements made by FBMC for the purpose of concealing their false note scheme. Therefore, contrary to the Petitioner's arguments, the Government did not constructively amend the indictment by presenting evidence of the wire transfers or their disbursements.

Finally, the Petitioner contends that the Government constructively amended the indictment by introducing evidence of actual losses suffered by Ginnie Mae when loss was not an essential element of any of the crimes

charged in the indictment.  The Petitioner's claim is belied by the record.

The Government did not introduce evidence of how much money Ginnie Mae lost due to FBMC's fraud.  Instead, the Government offered evidence of how much money Ginnie Mae reimbursed Market Street – the loan servicer who took over FBMC's loans.  The trial testimony concerned loans for which Market Street could not collect past due payments or find collateral to foreclose.  [Id., Trial Tr. Vol. IV, at 1087-94].  Specifically, Market Street's representative testified that it could not collect on most FBMC loans because it could not locate many of the borrowers named on the loans issued by FBMC and found "bad addresses" when it tried to foreclose on the collateral listed on FBMC loan documents. [Id., Trial Tr. Vol. IV, at 1091-93].  The testimony of Market Street's representative that Ginnie Mae paid out over $23 million by the time of trial was relevant to the charged conspiracy and money laundering counts.  It also was relevant to whether the fraudulent loans affected HUD.  Moreover, this evidence rebutted the conspirators' claim that they did not knowingly commit fraud, but instead made manufactured home loans which were authorized by Ginnie Mae.

The Government's evidence did not improperly broaden the offenses charged in the indictment.  Instead, the evidence offered at trial tracked the indictment and proved the Petitioner's guilt on the charged offenses beyond

a reasonable doubt.  United States v. Ward, 486 F.3d 1212, 1228 (11th Cir. 2007), *certiorari denied* 552 U.S. 960, 128 S.Ct. 398, 169 L.Ed.2d 280 (2007) (indictment alleging mail fraud and wire fraud counts was not constructively amended by incorporation of a charged conspiracy by reference). Consequently, counsel was not ineffective for failing to challenge the evidence at trial or to raise this issue on appeal.  Strickland, 466 U.S. at 687-88, 694.

### 2. Multiplicitous Indictment[15]

The Petitioner contends that counsel was ineffective for failing to object to Counts Nine and 10, 37 through 41, 43 and 44, and 46 through 52 because they are multiplicitious.  He contends that Counts Nine and 10 are multiplicitous because the loans secured by the two addresses in those Counts were sold to Fannie Mae under the same contract.  He claims that the other counts are multiplicitous because the counterfeit mortgage notes alleged separately in each of these counts were sold to Ginnie Mae investors in the same pools.

Multiplicity occurs when a single offense is charged in more than one count in an indictment.  United States v. Goodine, 400 F.3d 202, 207 (4th Cir. 2005), *citing* United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993), *certiorari denied* 508 U.S. 967, 113 S.Ct. 2949, 124 L.Ed.2d 696 (1993).  The

---

[15]Alleged in Ground #23, ¶ 3; also alleged in grounds 11-12 and 12b of the Petitioner's Motion to Vacate.

primary danger of a multiplicitous indictment is that a defendant "may be given multiple sentences for the same offense."  Burns, 990 F.2d at 1438.

Counts Nine and Ten allege two separate violations of 18 U.S.C. § 1343, the wire fraud statute.  Under § 1343, "wire fraud requires proof beyond a reasonable doubt that (1) the defendant participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud."  United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2009). Unlike some other fraud statutes, however, § 1343 targets the execution of the scheme to defraud, not the creation of the scheme itself.  Id. at 1241.  "When an act is 'chronologically and substantively independent' from the other acts charged as the scheme, it constitutes an execution."  United States v. Colton, 231 F.3d 890, 909 (4th Cir. 2000).  Consequently, the statute "punishes each interstate wire transmission that carries out [the] scheme."  Williams, 527 F.3d at 1240, citing Sibley v. United States, 344 F.2d 103, 105 (5th Cir. 1965), certiorari denied 382 U.S. 945, 86 S.Ct. 405, 15 L.Ed.2d 354 (1965).

Count Nine of the superseding indictment charged that the defendants caused Fannie Mae to wire a payment to FBMC on October 1, 1998, for purposes of a fraudulent loan purportedly secured by a residence located at 9101 Crosstimbers. [Criminal Case No. 3:02cr156, Doc. 45, at ¶ 52].  Count 10

charged that the defendants caused a separate wire transfer on October 5, 1998, for the purchase of a different fraudulent loan purportedly secured by a residence at 9001 Penstemmons. Id. The Petitioner contends that these two loans were sold to Fannie Mae together as part of one contract, funded together under one purchase advice, and shipped together as one loan package. Therefore, according to the Petitioner, they constituted only one alleged violation of § 1343. Each wire transfer, however, was made on a different day to secure a different fraudulent loan secured by a different property. Consequently, each wire transfer constituted a separate execution to further the scheme to defraud Fannie Mae, and Counts Nine and 10 were not multiplicitous. Colton, 231 F.3d at 909.

Counts 37 through 52 charge that the defendants made, passed and uttered different counterfeit mortgage notes. [Criminal Case No. 3:02cr156, Doc. 45, at ¶¶ 60-61]. The Petitioner contends that because the mortgage notes identified in Counts 37 through 39 were sent together in one pool, submitted on the same day in a single data file, and shipped as a single loan package, he should have been charged with only one count of violating 18 U.S.C. § 1010, not three. He makes the same contention with respect to Counts 40 and 41, Counts 43 and 44, Counts 47 and 48, and Counts 49 through 52. However, 18 U.S.C. § 1010 punishes "whoever . . . makes, passes [or]

utters . . . *any* statement, knowing the same to be false . . .or counterfeits *any*

instrument . . . or utters, publishes, or passes as true *any* instrument, paper, or

documents, knowing *it* to have been . . . counterfeited." (emphasis provided).

Like the wire fraud statute, it is clear from § 1010 that Congress intended that

the making of each false or counterfeit document would constitute a separate

violation of the law. Bins v. United States, 331 F.2d 390, 393 (5th Cir. 1964),

*certiorari denied* 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964) (holding that

the filing of two different false documents in the same transaction constituted

two crimes under 18 U.S.C. § 1010). "Whether a continuous transaction results

in the commission of but a single offense or separate offenses is not dependent

on the number of unlawful motives in the mind of the accused, but is

determined by whether separate and distinct prohibited acts, made punishable

by law, have been committed." Id.

Each of Counts 37 through 52 specifically describes a different

promissory note that was "made, passed or uttered," each on a different date.

[Criminal Case No. 3:02cr156, Doc. 45, at ¶ 61]. Each promissory note was

issued in the name of a different borrower, and secured by a different property.

Id. At trial, the Government introduced into evidence copies of each of the

counterfeit notes charged in Counts 37 through 52. In short, the indictment and

evidence at trial showed that Counts 37 through 52 arose from separate

counterfeit mortgages, and that each, therefore, constituted a separate violation of § 1010. Consequently, the Petitioner's claim that his counsel was ineffective for failing to challenge these Counts on the grounds of multiplicity at trial and on appeal is without merit. Strickland, 466 U.S. at 687-88, 694.

The Petitioner also claims that counsel should have challenged Counts 37 through 52 as multiplicitous at sentencing. For the reasons articulated in the preceding paragraphs, there is no legal or factual basis to support the Petitioner's claim that these counts were multiplicitous or that the sentences imposed violated the Double Jeopardy clause of the Constitution. Therefore, the Petitioner's claim that counsel was ineffective for raising this issue at sentencing is without merit. Id.

### 3. Duplicitous Indictment[16]

Next, the Petitioner contends that counsel was ineffective for failing to challenge various counts in the indictment as duplicitous. "Duplicity" is the joining together of two or more distinct and separate offenses in a single count. United States v. Hawkes, 753 F.2d 355, 357 (4th Cir. 1985). Where a statute provides more than one means of committing the same offense, the policy against duplicity does not prohibit the Government from charging more than

---

[16]Alleged in Ground #23 ¶ 16; also alleged in grounds 3-4, 19a & b of the Petitioner's Motion to Vacate.

one of those means in the conjunctive, in one count.  <u>United States v. Brandon</u>, 298 F.3d 307, 314 (4th Cir. 2002) (citations omitted); <u>see</u> <u>also</u>, Fed. R. Crim. P. 7(c) (a single count may allege that a defendant committed an offense by one or more means).  Furthermore, a guilty verdict will stand if the evidence presented at trial is sufficient with respect to any one of the acts charged. <u>Brandon</u>, 298 F.3d at 314 (citations omitted).  The rule against duplicity also does not prevent an indictment from alleging more than one act in a single count if the acts are part of a continuous course of conduct.  <u>United States v. Smith</u>, 373 F.3d 561, 563-64 (4th Cir. 2004), *certiorari denied* 543 U.S. 1123, 125 S.Ct. 1048, 160 L.Ed.2d 1073 (2005).

Petitioner's duplicity claims appear to fall into two categories:  (1) single counts that allege the submission of more than one HUD form (Counts 11 through 21 and 22 through 32); and (2) single counts that appear to allege more than one purpose for committing the same offense (Counts 37 through 52). Counts 11 through 21 and 22 through 32 each allege an offense – wire fraud or making false statements – with respect to different Ginnie Mae mortgage-backed security pools.  [Criminal Case No. 3:02cr156, Doc. 45, at ¶¶ 53-57]. The Petitioner contends that it was improper to allege in each count that the defendants transmitted, or made false statements on, HUD forms 11705 *and* 11706 because they are two separate forms.  FBMC, however, could not issue

a Ginnie Mae mortgage-backed certificate and collect the investors' funds until it had submitted *both* forms. It is not relevant when or how these forms were submitted to Ginnie Mae since both were required before FBMC could receive funds for the fraudulent mortgages it pooled. Conversely, there was no possibility that the Petitioner could have been convicted or acquitted on the submission of one form, but not the other. In short, each of Counts 11 through 21 and 22 through 32 allege a continuous course of conduct with respect to a different mortgage pool and none is duplicitous.

Counts 37 through 52, on the other hand, allege the making and passing of false statements and counterfeit mortgage notes to HUD in violation 18 U.S.C. § 1010. [Id., Doc. 45, at ¶¶ 60-61]. The Petitioner contends that the indictment was duplicitous because each of these counts charged the defendants both with making and passing false statements and counterfeit notes with the intent that false mortgage notes be accepted by HUD for insurance-backing and with making and passing false statements and counterfeit notes with the intent to influence the actions of HUD with respect to Ginnie Mae's guarantee of mortgage notes placed in mortgage-backed securities pools. In other words, because the indictment, according to the Petitioner, alleged two different purposes behind the making and passing of false statements and counterfeit notes, each of Counts 37 through 52 is

47

duplicitous because each alleges two different violations of the same statute.

Section 1010 is comprised of multiple clauses in the disjunctive. <u>Tripp v. United States</u>, 381 F.2d 320, 321 (9th Cir. 1967). Rules of federal pleading require the government to charge in the conjunctive in such instances. <u>United States v. Montgomery</u>, 262 F.3d 233, 242 (4th Cir. 2001), *certiorari denied* 534 U.S. 1034, 122 S.Ct. 576, 151 L.Ed.2d 448 (2001) (citations omitted).

The essence of a violation of § 1010 is the knowing use of false documents for the purpose of influencing HUD. <u>Bins</u>, 331 F.2d at 392 (citations omitted); <u>United States v. Berenstein</u>, 533 F.2d 775, 787 (2nd Cir. 1976), *certiorari denied* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). Because the statute is in the disjunctive, an allegation of more than one purpose for influencing HUD does not render the indictment duplicitous. <u>Tripp</u>, 381 F.2d at 321 (holding that an indictment's failure to list all of § 1010's articulated purposes for influencing housing authority did not render the indictment defective). Furthermore, a guilty verdict will stand if the evidence presented at trial was sufficient to show that the defendant knowingly used false documents to influence HUD. <u>Brandon</u>, 298 F.3d at 314 (citations omitted).

There is no legal or factual basis to support the Petitioner's claim that subject counts in the indictment were duplicitous. Therefore, the Petitioner's claim that his counsel was ineffective for failing to raise this issue at trial and on

appeal must fail.  Strickland, 466 U.S. at 687-88, 694.

### 4.  Challenges to Counsel's Trial and Appellate Strategy

The Petitioner asserts a litany of ineffective assistance of counsel claims regarding counsel's trial strategy that amount to nothing more than second-guessing a reasonable trial strategy.  "A decision consistent with a reasonable trial strategy cannot support a claim of ineffective assistance of counsel." Strickland, 466 U.S. at 689.

At trial, the Petitioner's strategy was to convince the jury that his actions were consistent with his understanding of proper mortgage practice and that he did not intend to violate the law.  To that end, the Petitioner testified on his own behalf, and his counsel actively cross-examined Government witnesses.  Even if the Petitioner could show that his counsel was deficient in some respect at trial, he cannot show a "reasonable probability" of a different result sufficient to meet Strickland's prejudice prong.  Id., at 694.

### a.  Failure to Present Certain Evidence[17]

The Petitioner claims that trial counsel was ineffective for failing to introduce FBMC's Title I application and approval letter, which, according to him, would have shown that it had approval from HUD to issue loans for manufactured homes.  The Petitioner also claims that trial counsel was

_____

[17]Alleged in Ground #23, ¶¶ 5-6, 12, and 25 of the Petitioner's Motion to Vacate.

ineffective for failing to introduce FBMC's business plan and loan request letter to BB & T for a warehouse line of credit, which, according to him, would have shown that BB & T knew that FBMC was issuing construction loans and loans for manufactured housing.

For the reasons stated in the section of this Order denying the Petitioner's Brady claim, he has failed to show that counsel was deficient for failing to introduce these documents at trial. Strickland, 466 U.S. at 687-88. Likewise, he has failed to show that there is a reasonable probability that had counsel introduced them, the outcome of the Petitioner's trial could have been different. Id. at 694.

The Petitioner also faults counsel for failing at trial to "state" a laundry list of facts that supposedly showed that the Petitioner acted in good faith and that the Government failed to prove that he acted with specific intent or willful blindness. This claim is wholly without merit, as the only evidence the Petitioner points to that supposedly showed his good faith is evidence that his attorney introduced at trial or elicited on cross-examination or that the Government introduced at trial. In short, he has failed to identify any actions counsel failed to take at trial to demonstrate the Petitioner's good faith belief that the investor program was legal and that he had no intent to act illegally.

The Petitioner also claims that counsel was ineffective for "failing to

subpoena evidence from Fannie Mae, Ginnie Mae, and Hud [sic], when asked by Movant to do so several time [sic]."  [Doc. 1-1, at 53].  The Petitioner fails to identify the evidence that counsel could have subpoenaed and also fails to demonstrate that there is a reasonable probability that presentation of that evidence would have resulted in an acquittal.  Such a vague allegation does not create a claim of ineffective assistance of counsel.  Rules Governing § 2255 Proceedings, Rule 2.

### b.  Failure to Impeach Government Witnesses[18]

The Petitioner claims that counsel was ineffective for failing to "impeach the perjured testimony" of FBMC employee Sharon Abrams with evidence that she had access to HUD manuals, regulations and forms via the Internet.  This claim is without merit.  As previously discussed, not only has the Petitioner failed to show that Abrams' testimony was perjured, but the jury heard the evidence that the Petitioner claims should have been presented through impeachment.

The Petitioner testified in his direct examination that all FBMC employees had ready access to Fannie Mae and Ginnie Mae manuals via the internet at their desks and that such materials were available "on websites offered to the

---

[18]Alleged in Ground 23 ¶¶ 7-10, 13-14, 18-19, and 22-23 of the Petitioner's Motion to Vacate.

public." [Criminal Case No. 3:02cr156, Trial Tr. Vol. V, at 1237]. Further, Abrams testified that although she did not have access to the internet, she could review hard copies of the manuals, but she had to borrow them from either Richiedean Gess or Petitioner. [Id., Trial Tr. Vol. II, at 271-72]. She also testified that when her job changed within FMBC she asked the Petitioner for manuals to help her set up her new department and that he gave her a box of quality control manuals, which she kept. [Id., Trial Tr. Vol. II, at 295]. In fact, one of the manuals warned that "straw borrowers schemes" are illegal. [Id., Trial Tr. Vol. II, at 297]. The Petitioner has not established that counsel was ineffective with respect to his handling of Sharon Abrams. Strickland, 466 U.S. at 687-88, 694.

Next, the Petitioner contends that counsel was ineffective for failing to impeach "the false testimony" of former FMBC underwriter and co-defendant Richiedean Gess that she was not consulted about underwriting the FMBC's construction loan program. Once again, however, the Petitioner cannot establish prejudice. Strickland, 466 U.S. at 694.

Not only has the Petitioner failed to show that Gess's testimony was perjured, but the jury heard the evidence that the Petitioner claims should have been presented through impeachment. As the Petitioner acknowledges in his Motion to Vacate, witness Barbara Byard testified that the construction loan

program was put together by the underwriters.  Furthermore, the Petitioner –

himself an FHA certified underwriter – testified that he had consulted Gess

about FBMC's "investor program" when the loans were sold to Fannie Mae.

[Id., Trial Tr. Vol. V, at 1322].

The Petitioner also claims that counsel was ineffective for failing to call

former FBMC employee Keith Jeffries as a defense witness to impeach Gess's

testimony that she knew that FBMC's pooling practices were illegal.  The

Petitioner contends that Jeffries would have testified that Gess told him FBMC's

pooling practices were approved in the Ginnie Mae manual.  As the

Government points out in its Motion for Summary Judgment, however, the fact

that Gess allegedly told Jeffries, FBMC's Chief Financial Officer at the time, that

the pooling practices were lawful would not establish that she did not, in fact,

know that the practices were unlawful.  Consequently, the Petitioner cannot

show that he was prejudiced by counsel's decision not to call Jeffries as a

witness.[19]  Strickland, 466 U.S. at 694.

The Petitioner next contends that counsel was ineffective for failing to

---

[19]The Court notes that Jeffries also told the FBI several facts that could have
undermined both the Petitioner's defense and the defense of his wife, Macy, including
that the Petitioner maintained a private portfolio of loans that he had not yet sold that
was worth several million dollars [Doc. 16-1, at 5]; that he (Jeffries) became suspicious
of FBMC's source of assets in July, 2000 [Doc. 13-17, at 1-2]; that Macy McLean
controlled the funding at FBMC, [Id.]; and that Macy was responsible for selling the
lots/houses for the Ginnie Mae pools, while Petitioner had final approval over all of the
loans. [Id.].

rebut the testimony of Ginnie Mae account executive Sandra Dixon that two annual HUD verification forms submitted by FBMC were not legitimate Ginnie Mae forms. The Petitioner argues that the documents were critical to establishing his good faith belief that the forms authorized FBMC to pool loans for mobile and manufactured homes. A review of the record reveals that the Petitioner suffered no prejudice from counsel's alleged failure.

Sandra Dixon testified that the "mobile" and "manufactured housing" blocks on FBMC's application to become a Ginnie Mae issuer were not checked; that she never told James McLean that it was permissible to pool manufactured home loans in single-family loan pools; and that Ginnie Mae stopped accepting applications to become a manufactured home loan issuer in the mid-1980's. [Criminal Case No. 3:02cr156, Trial Tr. Vol. VI, at 1641-43]. Consequently, even if counsel had refuted that the HUD *verification* forms were not Ginnie Mae forms, it would have had no impact on the Petitioner's defense because it was tangential to the import of Ms. Dixon's testimony that FBMC's *application* to become a Ginnie Mae issuer clearly omitted any reference to mobile and manufactured housing. Furthermore, the Petitioner cannot show that had counsel pressed Ms. Dixon on the point about the forms, she would have provided testimony sufficiently helpful to him to create a reasonable probability of a different result. <u>Strickland</u>, 466 U.S. at 694.

On a related issue, the Petitioner claims that counsel was ineffective for failing to call Mike Garcia, a Ginnie Mae account executive, as a defense witness to rebut Ms. Dixon's testimony that manufactured housing loans could not be placed in single-family loan pools. Here, once again, the Petitioner cannot establish either prong of the Strickland test. Garcia told FBI agents in a telephonic interview that he recalled being asked by other Ginnie Mae employees, including Ingrid Ripley, about the appropriateness of placing manufactured housing loans into single family mortgage pools. [Doc. 16-1, at 9]. Garcia told the FBI agents that such homes could be placed in a Ginnie Mae pool if they were "stick-built and are permanent." Id. Ingrid Ripley, testifying for the Government, stated that she took a call from the Petitioner on May 11, 2000, in which he asked a similar question about manufactured housing loans. [Criminal Case No. 3:02cr156, Trial Tr. Vol. VI, at 1647]. Ripley testified that she told the Petitioner that Title I and II manufactured housing loans could be placed in Ginnie Mae pools under certain conditions. [Criminal Case No. 3:02cr156, Trial Tr. Vol. VI, at 1648]. Ms. Ripley also testified that Ginnie Mae had not approved anyone or any entity as a manufactured housing mortgage-backed securities issuer since before 1996, which was consistent with Ms. Dixon's testimony. [Criminal Case No. 3:02cr156, Trial Tr. Vol. VI, at 1642-43,1649]. Furthermore, Mike Garcia told FBI agents that Ginnie Mae did

not pool Title I loans, which also was consistent with Ms. Dixon's testimony [[Doc. 16-1,at 9]. The Petitioner cannot show that had counsel called Garcia as a defense witness, he would have provided testimony sufficiently helpful to Petitioner to create a reasonable probability of a different result. Strickland, 466 U.S. at 694.

In his next claim, the Petitioner contends counsel was ineffective for failing to impeach witness Eric Brown with respect to several alleged inconsistencies in his testimony. The only evidence Petitioner cites to support this assertion, however, is other testimony by Brown. Because the jury had the benefit of having heard Brown's allegedly inconsistent statements before making its credibility determinations, the Petitioner cannot prove that he was prejudiced by counsel's alleged failure. Strickland, 466 U.S. at 694.

In a related claim, the Petitioner contends that counsel should have moved to suppress Brown's testimony, as well as that of his father. It appears that the Petitioner believes counsel should have moved to suppress on the grounds that the testimony concerned transactions not alleged in the indictment. Such a motion, however, would not have been successful. Eric Brown testified on direct examination that he and his father met with Debbie and Paul Zimmerman and the Petitioner to discuss FBMC's financing for the development of a track of land owned by Brown and his family. [Criminal Case

No. 3:02cr156, Trial Tr. Vol. IV, at 861-63]. When Debbie Zimmerman presented them with completed mortgage loan notes in the names of their family members and several people that they did not know, Mr. Brown and his father refused to sign until they could show the documents to their attorney. [Criminal Case No. 3:02cr156, Trial Tr. Vol. IV, at 868]. Debbie Zimmerman would not permit Mr. Brown or his father to leave the premises with the completed loan agreements. [Criminal Case No. 3:02cr156, Trial Tr. Vol. IV, at 870]. When the Petitioner arrived at the meeting, he also said the notes could not leave the office and stated "Look, this – this is legal, but it's not really legal." [Criminal Case No. 3:02cr156, Trial Tr. Vol. IV, at 871].

This evidence was admissible because it occurred during the life of the alleged conspiracy and involved the same scheme to defraud. It showed the existence of a conspiratorial agreement between the charged defendants as charged in Count One, and it described additional overt acts that occurred in furtherance of that conspiracy. United States v. Janati, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment.").

Moreover, the law is clear that "'[e]vidence of other crimes, wrongs, or

acts' that is not intrinsic to the crime may still be admissible if it demonstrates 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" <u>United States v. Higgs</u>, 353 F.3d 281, 311 (4th Cir. 2003), *certiorari denied* 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 465 (2004). Insomuch as the subject testimony was relevant to show the defendants' knowledge that their conduct was illegal and to establish a pattern of conduct similar to that charged in the indictment, the Petitioner cannot show that there is a reasonable probability that the Court would have granted a motion to suppress Brown and Moore's testimony. Consequently, the Petitioner cannot establish prejudice on the basis of counsel's decision not the challenge the admissibility of the evidence. <u>Strickland</u>, 466 U.S. at 694.

Finally, the Petitioner claims that counsel was ineffective for failing to call as a witness an unnamed private investigator who attempted to interview Eric Brown for the defense. According to the Petitioner, the investigator would have testified that when first approached, Mr. Brown initially did not appear to know who the Petitioner was. However, the Petitioner has not identified any statement Brown made to the investigator that contradicts his trial testimony. More importantly, the Petitioner cannot show that there is a reasonable probability that he would not have been convicted of Count One had the investigator testified about his "impression" of Mr. Brown, assuming such

testimony would have been admissible.  Strickland, 466 U.S. at 694.

### c.  Failure to Raise Issues of Prosecutorial Misconduct[20]

The Petitioner claims that counsel was ineffective at trial and on appeal for failing to raise the issue of prosecutorial misconduct, "when a lot of the government witnesses testified falsely and the prosecutor knew it and failed to correct it."  [Doc. 1-1, at 50].  For the reasons stated in the sections of this Order addressing the Petitioner's claims of prosecutorial misconduct and ineffective assistance of counsel, this claim is without merit.

### d.  Failure to Argue Petitioner was Legally Innocent of Money Laundering Convictions

In his amendment to his § 2255 motion, the Petitioner claims that counsel was ineffective at trial and on appeal for failing to argue that he was legally innocent of the money laundering offenses based on the reasoning of United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 170 L.Ed.2d 912 (2008). [Doc. 3.]  In Santos, the Supreme Court considered the question of whether the term "proceeds" in 18 U.S.C. § 1956(a)(1), the federal money laundering statute, means "receipts" or "profits."  553 U.S. at 509.

In a 4-1-4 decision, the justices in the plurality held that the term "proceeds," which was undefined in the statute, was ambiguous and without

---

[20]Alleged in Ground 23 ¶ 17 of the Petitioner's Motion to Vacate.

legislative history adequate to clarify its meaning. Id., at 511-12. The plurality applied the rule of lenity and held that "proceeds," as used in § 1956(a)(1), means "profits," not total "receipts," from the criminal activity conducted. Id., at 514. Accordingly, "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid." Id., at 517.

Justice Stevens concurred in the judgment, agreeing that with respect to the gambling enterprise at issue in Santos, Congress has not indicated its intent as to whether "proceeds" should be defined to include all "receipts" or just the "profits." Id., at 524-26 (Stevens, J., concurring). Justice Stevens, however, declined to join the plurality in its holding that "proceeds" as used in § 1956 always means "profits" under the rule of lenity. Id. Instead, Justice Stevens explicitly recognized that the term "proceeds" could have a different meaning when referring to some specified unlawful activities as opposed to other activities and that "proceeds" should only be limited to "profits" under the rule of lenity where there exists no indication as to whether Congress intended the term to include the gross revenues of a particular unlawful activity or to be restricted to its profits. Id.

In the instant case, counsel was not ineffective at trial or on appeal for

failing to argue that the Petitioner was legally innocent of money laundering based on the reasoning in <u>Santos</u>. The law is clear that counsel is not constitutionally deficient for failing to anticipate a new rule of law. <u>Kornahrens v. Evatt</u>, 66 F.3d 1350, 1360 (4th Cir. 1995), *certiorari denied* 517 U.S. 1171, 116 S.Ct. 1575, 134 L.Ed.2d 673 (1996); <u>United States v. McNamara</u>, 74 F.3d 514, 517 (4th Cir. 1996) (holding that counsel was not ineffective for following the controlling circuit law at the time); <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1136 (4th Cir. 1992), *certiorari denied* 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993), *abrogated on other grounds* <u>Yeatts v. Angelone</u>, 166 F.3d 255 (4th Cir. 1999), *certiorari denied* 526 U.S. 1095, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999) (holding that trial counsel could not have been expected to object to the State's peremptory challenges, since trial predated <u>Batson</u> decision by several months).

Furthermore, the Petitioner was not involved in the type of specified unlawful activity addressed in <u>Santos</u>, and because Justice Stevens made clear his agreement with the plurality was limited to that type of unlawful activity,[21] an

---

[21]Justice Stevens's opinion represents the holding of the <u>Santos</u> Court. <u>See</u> <u>United States v. Mashburn</u>, 406 F.3d 303, 308 (2005), *quoting* <u>Marks v. United States</u>, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

argument related to "proceeds" as limited to "profits" in the mortgage fraud context would have failed under <u>Santos</u>. <u>United States v. Howard</u>, 309 Fed. Appx. 760, 771 (4th Cir. 2009), *certiorari denied* 130 S.Ct. 62, 175 L.Ed.2d 46, 78 USLW 3171 (2009) (recognizing that <u>Santos</u> was limited to the unlawful activity of gambling enterprises).

Finally, even if <u>Santos</u> did apply to mortgage fraud schemes, the Government produced ample evidence of both receipts generated from the scheme that were used to promote further unlawful activity and profits used for the personal expenses of the Petitioner, his family, and friends. Therefore, the Petitioner was properly convicted of money laundering, and he has not established deficiency in counsel's performance or prejudice in connection with his ineffective assistance of counsel claim.

### e. Insufficiency of the Evidence[22]

The Petitioner contends that the evidence against him was insufficient to prove that he acted with "intent," "knowledge," or "willful blindness/deliberate avoidance" or that he "aided and abetted" any of his co-defendants with respect to any of his convictions. He also contends that the evidence against him was insufficient to prove that any of the false statements/entries that he made were

---

[22]Alleged in Ground 23 ¶ 4 of the Petitioner's Motion to Vacate; also alleged in Grounds 13-18 and 20-21.

"material" as required to support convictions for Counts Two through 10, 11 through 21, 22 through 32, 33 through 36, 37 through 41, and 53 through 54. With respect to Counts 53 through 54, the Petitioner contends further that there was insufficient evidence to prove that BB & T was exposed to risk. The Petitioner claims that counsel was ineffective in his manner of making these specific arguments on direct appeal.

The record reflects that at the close of the Government's evidence and at the close of all of the evidence, counsel moved for judgment of acquittal on the grounds that the Government had presented insufficient evidence to support convictions on any of the charged counts. On appeal, counsel argued that this Court erred in denying the motions because the Government had failed to present "substantial evidence that [the Petitioner] had the requisite criminal intent to commit any of the charged offenses." [Brief of Appellants, at 27, McLean, supra. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322]. (emphasis added). Counsel also argued that the Government had "failed to introduce substantial evidence that [Petitioner] knew of any illegality at the time of the various transactions [with Fannie Mae, Ginnie Mae, and BB &T]." [Id., at 28] (emphasis added). Finally, counsel argued that "the Government failed to introduce evidence sufficient to support a verdict finding [the Petitioner] guilty of the charged crimes[.]" [Id., at 29.] In short, counsel argued on appeal that

the evidence presented at trial was insufficient to prove that the Petitioner had the requisite *mens rea* to commit the crimes alleged in the indictment.

The Fourth Circuit rejected these arguments. Furthermore, after reviewing the entire record, the Court concluded that "there was ample evidence for a reasonable trier of fact to have found defendants guilty beyond a reasonable doubt on each count of conviction." McLean, 131 Fed.Appx. at 41. Considering the broad sweep of the Court's conclusion, the Petitioner cannot show that there is a reasonable probability that the appellate court would have reached a different conclusion had counsel raised the other specific arguments outlined in Petitioner's motion. Strickland, 466 U.S. at 687-88, 694.

### f. Government's Improper Appellate Arguments[23]

The Petitioner claims that counsel failed to draw the appellate court's attention to allegedly improper statements in the Government's appellate brief. Specifically, the Petitioner contends that the Government misquoted a statement made by his wife, Macy, in her appellate brief; misquoted Eric Brown's testimony at trial; and misrepresented the number of houses that the defendants had built during the conspiracy. For the reasons stated in the section of this Order addressing Petitioner's claims of prosecutorial misconduct, this claim is without merit.

---

[23]Alleged in Ground 23 ¶¶ 11, 15, and 24 of the Petitioner's Motion to Vacate.

### g.  Failure to Adopt Co-Defendants' Arguments on Appeal[24]

The Petitioner claims that appellate counsel was ineffective for failing to adopt his co-defendants' challenge to the district court's decision to give a "willful blindness" instruction at trial.  The Fourth Circuit, however, affirmed the Court's decision to give this instruction, however.  <u>McLean I</u>, 131 Fed.Appx. at 38 (affirming willful blindness instruction as to the Petitioner's co-defendants and noting that such an instruction is appropriate "'when the defendant asserts lack of guilty knowledge but the evidence supports an inference of deliberate ignorance,'" *quoting* <u>United States v. Abbas</u>, 74 F.3d 506, 513 (4th Cir. 1996)). In light of the Petitioner's defense that he did not intend to act unlawfully in establishing and maintaining his "investor scheme," the instruction was equally appropriate in his case, and counsel was not ineffective for failing to adopt this issue on appeal.  <u>Strickland</u>, 466 U.S. at 687-88, 694.

The Petitioner likewise cannot succeed on his claim that appellate counsel was ineffective for failing to argue that he relied on Ginnie Mae manuals that purportedly stated it was appropriate to place manufactured home loans in single-family pools.  The Petitioner was not convicted of placing manufactured home loans in Ginnie Mae single-family pools; he was convicted of selling fraudulent loans.  Therefore, he cannot show that he was prejudiced

---

[24]Alleged in Ground 23 ¶¶ 26-27 of the Petitioners' Motion to Vacate.

by counsel's decision not to raise this issue on appeal.  Id.

### h. Downward Departure on Appeal from Resentencing[25]

At sentencing, trial counsel moved for a downward departure based on an alleged overstatement of Petitioner's criminal history.  U.S.S.G. § 4A1.3. The motion was denied and appellate counsel challenged the denial on direct appeal.  [Brief of Appellants, at 51-55, McLean, supra. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322].  Although, the Fourth Circuit vacated the Petitioner's sentence and remanded the case for resentencing in light of United States v. Booker,[26] it specifically rejected the Petitioner's argument that the Court had erred in denying the downward departure.  McLean I, 131 Fed.Appx. at 41 ("[W]e have considered each defendant's argument with respect to the application of the guidelines and conclude that the district court committed no error in that regard.").

At resentencing, the Court imposed the same sentence that it had previously.  McLean II, 192 Fed.Appx. at 235.  The Petitioner contends that counsel was ineffective for failing to raise the downward departure issue again on the direct appeal of his resentencing.  Counsel, however, could not have been ineffective for failing to raise an issue that the appellate court had

---

[25]Alleged in Ground 23 ¶ 20 of the Petitioner's Motion to Vacate.

[26]543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

adjudicated against the Petitioner on a previous appeal.  Bell, 5 F.3d at 66 (holding that the "law of the case" doctrine forecloses re-litigation of issues expressly or impliedly decided by the appellate court).  Therefore, this claim has no merit.  Strickland, 466 U.S. at 687-88, 694.

### i. Failure to File Petition for Writ of *Certiorari*[27]

The Petitioner asserts two claims with respect to counsel's handling of his Petition for Writ of *Certiorari* to the United States Supreme Court.  The first is that appellate counsel was ineffective for failing to file the petition after the Fourth Circuit affirmed Petitioner's convictions on direct appeal, as originally requested by him.  The second is that counsel was ineffective for failing to raise in the Petition for Writ of *Certiorari* all of the defective indictment issues raised in the instant §2255 motion and for failing to challenge the Court's refusal to grant the Petitioner a downward departure under U.S.S.G. § 4A1.3.  .

Attorney error amounts to constitutionally ineffective assistance of counsel only if a constitutional right to effective assistance of counsel exists.  Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Where there is no constitutional right to counsel, there can be no deprivation of effective assistance.  Wainwright v. Torna, 455 U.S. 586, 587-88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982).  An indigent criminal defendant has a

---

[27]Alleged in Ground 23 ¶ 28 of the Petitioner's Motion to Vacate.

Sixth Amendment right to the assistance of counsel through his first appeal. Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). He does not have a Sixth Amendment right to counsel in pursuing discretionary *certiorari* review in the Supreme Court. Austin v. United States, 513 U.S. 5, 8, 115 S.Ct. 380, 130 L.Ed.2d 219 (1994); Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further."). Consequently, there can be no Sixth Amendment deprivation of the effective assistance of counsel in the filing of a *certiorari* petition. Coleman, 501 U.S. at 752.

Furthermore, appellate counsel did file a Petition for Writ of *Certiorari*, albeit not until after the Petitioner's appeal of his resentencing. Evidently, that petition did not raise questions with respect to the indictment or the downward departure, as the Petitioner had requested. However, even if the Petitioner had the right to effective assistance of counsel at the discretionary review stage of the proceedings, he could not succeed on this claim. According to counsel, he researched the alleged indictment deficiencies and found them to be without merit. [Doc. 13-1]. Counsel is not required to assert all non-frivolous issues on appeal and, as demonstrated in this Order, the Petitioner cannot show that he was prejudiced by counsel's decision not to raise any of the instant claims in the certiorari petition. Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308,

77 L.Ed.2d 987 (1983); <u>Strickland</u>, 466 U.S. at 694.

## CERTIFICATE OF APPEALABILITY

The Court has considered the Petitioner's motion, any attached exhibits, and the record of the prior proceedings.  The Court finds that the Petitioner is not entitled to relief and therefore the motion must be dismissed.  The Court further finds that the Petitioner has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Miller -El v. Cockrell</u>, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted).  As a result, the Court declines to issue a certificate of appealability.  Rule 11(a), <u>Rules Governing Section 2255 Proceedings for the United States District Courts</u>.

# ORDER

**IT IS, THEREFORE, ORDERED** that the Government's Motion for Summary Judgment [Doc. 14] is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that the Petitioner's Motion under 28 U.S.C. §2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody [Doc. 1] is hereby **DENIED** and this action is hereby **DISMISSED**.

Signed: January 17, 2011

Martin Reidinger
United States District Judge